**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- X

**UNITED STATES OF AMERICA,**

           **- against -**                      **No. 22 Cr. 458 (LDS)**

**XIN JIN CHEN,**

                ***Defendant.***

-------------------------------------------------------------- X


*SENTENCING MEMORANDUM*
*ON BEHALF OF*
*XIN JIN CHEN*


*Ken Womble, Esq.*
*20 Vesey Street, Suite 400*
*New York, New York 10007*
*Tel: (718) 514-9100*
*womble@zemanwomblelaw.com*

*Counsel to the Defendant*

# ZEMAN & WOMBLE, LLP

KEN WOMBLE                                                          P  (718) 514 - 9100
20 VESEY STREET, RM 400                                             F  (917) 210 - 3700
NEW YORK, NY 10007                                     WOMBLE@ZEMANWOMBLELAW.COM
                          WWW.ZEMANWOMBLELAW.COM

December 28, 2024

***Via ECF and E-Mail***
Hon. LaShann DeArcy Hall
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:     *United States v. Xin Jin Chen*
                  *22 Cr. 458 (LDS)*

Dear Judge DeArcy Hall:

This sentencing memorandum is submitted in support of Xin Jin Chen, the above-referenced defendant, to assist the Court in its determination of an appropriate and reasonable sentence pursuant to Title 18 U.S.C. § 3553. Mr. Chen is scheduled to be sentenced on January 9, 2025. We are in agreement with the government that the appropriate Guidelines range is 24 to 30 months. However, considering the difficulty of Xin Jin Chen's life on the fringes of society and his minor role in the offense, I respectfully recommend that a sentence of probation with a period of home detention would be sufficient but no greater than necessary to achieve the ends of justice in this case.

## INTRODUCTION

Xin Jin Chen ("Chen") was raised in the poor farming villages of the Fujian province along China's southern coast. His father was a rice farmer whose crop haul could just feed the family and earn enough money for their most basic necessities. Chen grew up under the repressive authoritarian rule of the Chinese government. He learned at an early age that his life's path was set by the family he was born into. He experienced a loving family as a kid, but enjoyed none of the pleasures that many children raised in the liberal democracies of the world often take for granted.

When Chen was 13, he left school because his family could not afford to send him. When Chen turned 15, he got a job with a moving company for grocery stores in Fujian. At 18, he moved to the giant metropolis of Shanghai where he would spend the next decade of his life scraping together enough income through odd jobs and work at a gaming café to get by.

The unquestionable turning point in Chen's life was when he converted to Christianity 2016. His life was finally injected with purpose. Although Christianity rose in popularity in China after the economic reforms of the 1970's lifted strict cultural and religious restrictions, Christians still only represented a small fraction of the Chinese population. Chen enjoyed the community of his pseudo-underground church and realized that he wanted more out of life than the stationary existence he had experienced thus far.

Chen's newfound religion also brought ostracization and persecution. Faced with the difficulty of having to hide his true religious self in so many aspects of his life, Chen made the most fateful decision of his life. In 2019, he chose to flee China and immigrate to America.

## BACKGROUND

Xin Jin Chen was arrested and charged under the present indictment on October 13, 2022. Chen has been on Pretrial supervision since his arrest and has incurred no violations nor infractions. On March 20, 2024, Chen pled guilty to Count Eleven of the indictment, charging his involvement in the wire fraud conspiracy. Chen stipulated, in his plea agreement, to his overall involvement in the various fraudulent aspects of the charged conspiracies. The parties agree that the correct Guidelines calculation in this case reaches a range of 24 to 30 months. The parties' objections to Probation's calculation of a higher Guidelines range is sufficiently briefed in the government's November 27, 2024 letter to the Court[1] and the government's sentencing memorandum.[2] The parties agree to the following Guidelines analysis: (i) a final adjusted offense level of 17, (ii) a Criminal History Category of I, and (iii) an advisory Guidelines sentencing range of 24 to 30 months incarceration.

## XIN JIN CHEN'S HISTORY

### *Fujian Province to Oklahoma City*

As discussed above, Xin Jin Chen experienced a childhood that is both literally and figuratively foreign to this writer. China has spent the last 50 years attempting to merge modernization with the restrictions of authoritarian communism. This shift has seen little advancement in the rural farmlands like those where Chen grew up, while China's cities have exploded into the modern world. As a child, Chen and his family were stuck in the past. When he moved to Shanghai, he was impossibly overmatched by the fast-paced technology of one of the world's largest cities.

When Chen was in his late 20's, he thought he had found an answer to the chaos of the world swirling around him. Although Christianity was less taboo then it had been in China a generation before, there still existed a real danger of openly associating with this minority religion. Initially, Chen was able to continue to carry on his normal life. But as time went on, he found it impossible to hide his true beliefs. As his friends and community became aware that Chen was a Christian, he faced ostracization. Then that ostracization turned to prejudice before becoming

---

[1] Docket 252.
[2] Dkt. 264.

outright persecution. After he turned 30, Chen determined that continuing to live in China was impossible. Despite the dangers of the journey, Chen made his way to America.

When Chen arrived in America, he first moved to the small Chinese community of Oklahoma City. He no longer experienced religious persecution, but living as a Chinese immigrant in Oklahoma brought its own brand of intolerance. Although he lived in a large midwestern city, his actual life was limited to working long hours as a day laborer at giant agri-business and then nights at the handful of Chinese restaurants that would call him in to handle a shift as dishwasher or cook. When Chen did have occasion to interact with the residents of Oklahoma City, he felt like more of an outsider than at any point in his life.

When Chen left China for America, he only had the concept of America that he had cobbled together from conversations and the limited knowledge that slipped through China's robust information censors. As he dragged himself home to the small room in his dingy shared apartment in Oklahoma City, he could see the promise of America all around him. But living amidst it while being unable to participate in the parts of this country that make it so diametrically opposite to China in almost every way, shattered Chen's purpose.

After seasonal work took him to West Farmington, Ohio (a miniscule farming town), Chen finally was able to move to New York City.

### *New York City*

There was no amount of censorship that could limit the reach of New York City's reputation. Boasting the largest Chinese population of any city outside of Asia, over 600,000 people of Chinese descent live in New York City, making up roughly 10% of its population.[3] The city's Chinese communities represent almost equal amounts of United States citizens, naturalized citizens and undocumented immigrants.

> The percentage of Chinese citizens born in the United States is the lowest (31.8%) compared to other Asian ethnic groups in NYC. Of the total Chinese population in NYC, 31.8% are U.S.-born, 37.5% are naturalized citizens, and 30.7% are non-citizens. In contrast, most people in NYC became citizens by birthright (63.3%) and naturalization (20.9%). Some 15.8% of New Yorkers are non-citizens.[4]

Xin Jin Chen knew that he had not risked so much to come to America just to endure a new life living in the shadows of Oklahoma City. Through church connections and meager savings, he was finally able to make his way to New York City. Once he arrived, Chen was amazed by the size of the Chinese and Chinese American population.

New York City brought the community Chen had lost since he left China, but establishing a foothold in the city proved difficult. He spent the next few years barely employed in temporary and off the books jobs, typically as a cook at a handful of fast food Chinese restaurants. As he trudged along, making barely enough money to survive, he began to hear from people in the community about a different kind of 'job.' This 'job' did not require him to stand for hours on end in a hot

---

[3] https://www.aafederation.org/research/chinese-in-nyc-a-profile/
[4] *Id.*

kitchen for very little pay. The organizers of the conspiracy told Chen that he could make thousands of dollars just by making trips to the bank.

### Offense Conduct

Xin Jin Chen was not blind to the fact that what was being offered was not a job at all. He was well aware that this opportunity to finally pull himself off of the bottom rung of society involved fraud, thievery and was very much criminal. There is nothing offered in this submission that attempts to absolve Chen's behavior. Throughout this case, he has expressed shame and sorrow for his decision to participate in this conspiracy.

During the first half of 2022, Xin Jin Chen worked for the leaders of the conspiracy to launder and change millions of dollars through and using bank accounts he had created just for this purpose. Chen was utilized, along with a network of coconspirators to process the illegal proceeds of the larger fraud conspiracies that were controlled by his criminal bosses. Chen received a small fraction of the money for his services, but still collected more money for himself than he had ever seen in his life. He would give it all back to be able to return to the hardworking, Christian life that brought him to America in the first place.

### Arrest and Pretrial Supervision

When Xin Jin Chen was arrested by federal agents on October 13, 2022, his thin hope that he might avoid consequence for his actions was dashed. From that moment, though, Chen has complied with his Pretrial Supervision and has been engaged in the process with his counsel. He was one of the earliest defendants to plead guilty and he will be one of the first, if not the first defendant to be sentenced. For a relatively young man who made a terrible decision while he struggled in a foreign world that seemed intent on grinding him down, he has spent the last two years of his life learning from his mistakes and reconnecting with the Christian faith that sparked his journey to America.

## THE APPLICABLE LAW

In *United States v. Booker*, the Supreme Court expressly invalidated the provision in 18 U.S.C. § 3553(b)(1) which made the Sentencing Guidelines mandatory, and rendered the federal sentencing statute "effectively advisory." *United States v. Booker*, 543 U.S. 220, 245 (2005). The impact of *Booker* is that Guidelines sentencing calculations do not bar a sentencing court from using 18 U.S.C. § 3553(a) factors as a basis to arrive at more appropriate sentences. Sentencing courts are now permitted to weigh factors previously prohibited to achieve an appropriate and reasonable sentence. This means that when a sentencing court finds a disproportionate relationship between the punishment prescribed by the application of the guidelines calculations and the particular facts and circumstances of a defendant, an alternative, more appropriate sentence may be imposed. *See also Kimbrough v. United States*, 552 U.S. 85 (2007).

In *Rita v. United States*, 127 S.Ct. 2456 (2007), the Supreme Court clarified that the task of the sentencing court requires an individualized assessment of the sentencing objectives enumerated in 18 U.S.C. § 3553(a) for the particular defendant before it, and in the context of all relevant characteristics of that defendant. 127 S.Ct. at 2464-2465. The Supreme Court in *Rita* held

that the abuse-of-discretion standard applied to appellate review of sentencing decisions within Guidelines range but that, while a sentence within an advisory Guidelines range may bear a presumption of reasonableness upon appellate review, the Guidelines are, at best, only a "rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* at 2465. It is beyond cavil that "sentencing courts, applying the Guidelines in individual cases may depart (either pursuant to the Guidelines or, since *Booker*, by imposing non-Guidelines sentence)." *Id.* at 2464.

Beyond the mere mechanical calculation of the Guidelines, a sentencing court clearly must assess the unique aspects and circumstances of a case in fashioning the sentence. The Guidelines are not a substitute for the district court's assessment and discretion at sentencing. Rather, they are but one among numerous factors to be considered. Just as the Supreme Court in *Rita* rejected the blanket presumption of reasonableness for within-Guidelines sentences, in *Gall v. United States*, 128 S.Ct. 586 (2009), the Supreme Court rejected the presumption of unreasonableness for sentences outside calculated Guidelines ranges.

In *Gall*, the Supreme Court held that the Guidelines should be the "starting point and the initial benchmark" for a district court's analysis of a reasonable sentence. Equally important, the sentencing judge "may not presume that the Guideline range is reasonable" and "must make an individualized assessment based on the facts presented." *Id.* at 596-597. Moreover, the Supreme Court rejected the appellate rule that required "extraordinary" circumstances or "rigid formulas" to justify a sentence outside the Guidelines range. *Id.* at 595. Thus, a sentencing court, after considering the advisory Guidelines sentencing range, is free to fashion a sentence that is reasonable and appropriate based upon all the sentencing factors set forth in § 3553(a). *See also United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) (The obligation to consider the calculated Guidelines range "does not mean mandatory adherence.").

## APPLICATION OF TITLE 18 U.S.C. § 3553(a)

An application of Title 18 U.S.C. § 3553(a) weighs in favor of a downward variance in fashioning an appropriate sentence for Xin Jin Chen. 18 U.S.C. § 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary," to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant, *inter alia*. The ultimate goal of the sentencing court is to find just punishment by carefully balancing important public policy considerations along with the prophylactic and rehabilitative objectives of 18 U.S.C. § 3553(a).

18 U.S.C. § 3553(a) directs a sentencing court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, and (C) to protect the public from further crimes of the defendant; and (3) the kinds of sentences available.

Xin Jin Chen has shown, by his compliance with Pretrial Services over the last 26 months, that he can, and indeed has, changed his mindset. Avoiding a devastating prison sentence and continuing supervision via a sentence of probation would achieve the goals of sentencing as set forth in § 3553(a). The imposition of this sentence would impress upon Chen the requirement

that any failure to comply with the terms and conditions of probation will be met with a prison term, while also highlighting the rehabilitative foundation of the federal sentencing regimen.

### § 3553(a)(1):  Nature and Circumstances of the Offense and the History and Offender Characteristics

As described in the government's sentencing submission, the larger conspiracy charged in this case was very serious and involved fraud, deceit and the theft of millions of dollars. The leaders of the conspiracy received the vast majority of the proceeds and employed a network of individuals, like Chen, to launder and change the proceeds of their fraud. Xin Jin Chen acknowledged, through his plea, that he committed crimes as a worker for the heads of this conspiracy. An individual assessment of his involvement, though, must recognize that he was a minor participant, and received a small percentage of the funds he illegally moved, with the bulk of those funds returning to those who ran the conspiracy.

Although Xin Jin Chen did willingly and knowingly participate in this conspiracy, his crimes were an aberration in an otherwise hardworking life. The vast majority of Chen's working life, which started when he was still a child, has been spent in honest labor, on his family farm a young age, and then at grueling agricultural jobs and back-of-restaurant work once he arrived in America. Chen's decision to commit these crimes was wrong and he fully takes responsibility for that. However, when this exhausted man was presented with an opportunity to finally end the constant struggle of the destitute life he had always experienced, he did not have the strength to resist. This arrest and prosecution, as well as internal reflection against the teachings of his faith, have taught Chen the error of his decisions. That lesson has been reinforced by the process of facing this federal case the restrictions of Pretrial Services. Chen has exhibited over the last two years that it is a lesson he has learned.

### § 3553(a)(2):  The Need for the Sentence Imposed:
#### (A) To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense;
#### (B) To Afford Adequate Deterrence to Criminal Conduct;
#### (C) To Protect the Public from Further Crimes of the Defendant;

Over the last two years, Xin Jin Chen has been compliant with the terms and conditions of his Pretrial Release. Continuation of supervision through a sentence of years of probation with a period of home detention would be a variance below the Guidelines range of 24 to 30 months, but would provide just punishment for Chen's minor participation in the overall conspiracy. Imposition of such a sentence would continue to supervise Chen, a regimen that will continue to deter him from making any similar decisions to the ones that brought him before this Court. Should he backslide, the hopefulness of a merciful sentence could vanish. However, should he complete his supervision with the same purpose he has complied with Pretrial Services over these last two years, such an outcome would be the realization of a sentence sufficient but no greater than necessary to achieve the ends of justice. Such a sentence would, in retrospect, promote the greatest respect for the law, a goal that can be achieved by mercy as well as punishment.

### *§ 3553(a)(3):  The Kinds of Sentences Available*

There is no legal impediment preventing this Court from imposing the sentence suggested herein.  Indeed, the type of particularized analysis sought operates to fulfill the goals of the Sentencing Reform Act by asking the Court to inspect the nuances of the life of the individual whom the Court is going to sentence. I am compelled to remind the Court of the enormous fiscal costs of incarceration.  The current monthly cost of imprisonment is approximately $3,688.00; the yearly cost of imprisonment is approximately $44,258.00. Thus, in addition to the destructive and traumatic effects incarceration would have on Chen, it also imputes a large and unnecessary financial burden on our society.

### <u>CONCLUSION</u>

The future is uncertain. But a sentence grounded in hope is the better part of justice. Xin Jin Chen, who may be the first defendant sentenced in this case, has fully accepted responsibility for his crimes and has shown that he wishes to learn from his mistakes. A probation sentence with home detention is the appropriate sentence to punish his criminal conduct, while also understanding his history and the factors that led this man to this point.

We thank the Court for its consideration of the issues presented herein.

Respectfully submitted,

*Ken Womble*

Ken Womble, Esq.
Counsel to Xin Jin Chen

cc:  AUSA Benjamin Weintraub (via ECF & E-mail)